# EXHIBIT 2

```
--------------------------------X
In the Matter of the Arbitration
                                X
         between
                                X
ALARIS HEALTH AT HAMILTON PARK¹
AND CONFIDENCE MANAGEMENT SYSTEMS X   Re:  Applicability of
                                           Hamilton Park
          "Employers"          X           Collective Bargaining
                                           Agreement to
        -and-                   X           The Atrium

1199SEIU UNITED HEALTHCARE      X     REVISED AWARD
WORKERS EAST
                                X
          "Union"
--------------------------------X
```

**APPEARANCES**

> **For the Employers**
> JASINSKI, P.C.
>   David F. Jasinski, Esq., Of Counsel
>
>
> **For the Union**
> GLADSTEIN, REIF & MEGINNISS, L.L.P.
>   Katherine H. Hansen, Esq., Of Counsel
>   William S. Massey, Esq., Of Counsel

**BEFORE:**  Martin F. Scheinman, Esq., Arbitrator

---

[1] The caption reflects the current name of the Employer as Alaris Health At Hamilton Park.

**BACKGROUND**

This case disputes whether the Employers violated the parties' Collective Bargaining Agreement ("Agreement") by removing dietary, maintenance and housekeeping work performed at The Atrium at Hamilton Park ("The Atrium") from the bargaining unit subsequent to the sale of Hamilton Park Healthcare Center ("Hamilton Park") and The Atrium in 2013.  The Union contends the employees working in these titles had been properly included in the bargaining unit prior to the sale and, therefore, the Employers' decision to unilaterally remove them from the bargaining violated the Agreement. It asks for a determination the Agreement applies to The Atrium's workers and for a make whole remedy for employees performing Dietary and Housekeeping work at The Atrium.

Most of the basic facts are not in dispute.

Hamilton Park is a long-term care facility located at 525 Monmouth Street, Jersey City, New Jersey.  (Transcript 205). The Union has represented the employees at Hamilton Park since 2005.  Hamilton Park was a member of a multi-employer bargaining group which entered into an agreement with the Union for the period June 15, 2005, through June 15, 2008.  ("2005 Agreement").  (Union Exhibit No. 2).

The 2005 Agreement defined the bargaining unit as follows:

### ARTICLE 1 – BARGAINING UNIT

1.1 The Employer recognizes the Union as the sole and exclusive bargaining agent for all employees excluding from the bargaining unit office clerical employees, supervisors, watchmen and guards.  In the event a dispute arises as to whether not an employee does in fact, come within one of the excluded categories above mentioned, such dispute shall be submitted to arbitration for settlement and determination in the manner hereinafter provided.  No supervisors shall perform bargaining unit work, except for purposes of instruction or in any emergency.  Bargaining unit descriptions for each individual Signatory are attached in "Schedule A" and herein incorporated by reference.

Attachment A of the 2005 Agreement, which is a list of signatory employers, refers to the Employer as "Hamilton Park Health Care Center, including The Atrium".  Attachment A of the Agreement covering the period March 13, 2008, through February 28, 2013, ("2008 Agreement") (Joint Exhibit No. 2), lists Hamilton Park as a signatory employer, but omits reference to the reference to The Atrium.

The 2008 Agreement in Article 34, entitled Duration, provided the Union with the opportunity to reopen the Agreement to negotiate wages, hours and general terms and conditions of employment.  The Union exercised this right and when the parties could not reach an agreement and the matter was submitted to final and binding arbitration before me.  Thereafter, on

November 7, 2012, I issued an Award extending the 2008 Agreement
until June 30, 2016.  (Joint Exhibit No. 3).

Prior to October 2012, Union dues were remitted on behalf
of the approximately fifteen (15) individuals employed at The
Atrium in the Dietary, Housekeeping and Maintenance Departments.
For the period April 5, 2009, to September 29, 2012, payment was
made by check payable from The Atrium at Hamilton Park and
signed by Lorrain Mocco. (Union Exhibit No. 4).  Separate
payments were received by the Union from Hamilton Park Health
Care Center, Ltd., for dues on behalf of those Union employees
(approximately one hundred forty (140)) working at Hamilton Park
Facility. (Union Exhibit No. 4). Checks for those payments were
also signed by Mocco.

During the same period of time, the Taft-Hartley Fund, the
Union's Benefit Fund, received payments on behalf of the
employees working at the Hamilton Park facility and The Atrium
facility. (Union Exhibit No. 3). As of October 14, 2012, The
Atrium employees were transferred to the Hamilton payroll and
the Union began receiving checks for dues from Hamilton Park. As
well, payment to the 1199SEIU Greater New York Funds for the
transferred employees was paid from Hamilton Park.  The payments
continued to cover both Hamilton Park and The Atrium employees.
(Union Exhibit Nos. 3 and 4).

4

On November 1, 2012, Hamilton Park sent notice under the Milville Dallas Automotive Plant Job Loss Notification Act of a mass layoff on December 31, 2012.  (Exhibit B of Employers' submission September 14, 2015).  The reason stated for the mass layoff was Hamilton Park was planning to sell the business. On that same day, Hamilton Park sent notice of the impending layoff to its employees pursuant to the Worker Adjustment and Retaining Act of 1988.  ("WARN").  (Exhibit C of Employers' September 14, 2015, submission).

By letter dated November 5, 2012, the Union informed Hamilton Park it was not in compliance with Article 32 of the 2005 Agreement, which required Hamilton Park to include in any contract of sale the purchaser would retain all employees and assume all terms of the Agreement.  The Union demanded the Employer rescind any determination to terminate the employment of any bargaining unit employee.  (See, Exhibit D of the Employers' September 14, 2015, submission).

On November 9, 2012, the Union filed a grievance alleging the Employer failed to comply with Article 32 of the Agreement. (See, Exhibit E of the Employers' September 14, 2015, submission).  The matter was then submitted to arbitration. (See, Exhibit F of the Employers' September 14, 2015, submission).

The Union subsequently filed an action in the United States District Court for The District of New Jersey, for a temporary restraining order and motion for preliminary injunction to enjoin the sale of the Employers' business.[2]  On April 19, 2013, the Court issued an Order which stated in pertinent part as follows:

> **WHEREAS**, the Court entered an Order, dated December 28, 2012, enjoining the sale of Defendant ("December 28 Order");
>
> **WHEREAS**, Hamilton Park Opco, LLC has agreed to assume the entire Collective Bargaining Agreement including the November 2012 Interest Arbitration Award….
>
> 2.    The December 28 Order will remain in effect until Hamilton Park, Opco, LLC formally assumes the entire Collective Bargaining Agreement including the November 2012 Interest Arbitration Award by entering into an assumption agreement with the Union….   (U. 7).

In accordance with the Court's Order, an Asset Purchase Agreement (E. 2) was executed between Hamilton Park Opco, LLC, as the buyer and Hamilton Park Health Care Center, LTD as the seller,[3] in which it was agreed as follows:

> 9.5
>
> Buyer and Seller agree that Buyer will assume the CBA and be subject to all of the rights and obligations of the CBA, allowing the Buyer to effectively step into the shoes of the Seller with respect to Seller's rights and obligations under the CBA, and specifically article 32 of the

---

[2] At the time the Union initiated the court proceeding, Hamilton Park Opco, LLC, was identified as the potential buyer.
[3] The Asset Purchase Agreement was signed by Peter Mocco and Lorraine Mocco as indemnitors.

CBA, including but not limited to Buyer's
obligations to retain all of the employees,
be personally responsible for all unpaid
wages, all fund payments, vacations, holidays,
sick leave and all other monetary items (the
"CBA Requirements").

The Asset Purchase Agreement also stated as follows:

4.22  Employees; Employee Benefit Plans.
Attached hereto as Schedule 4.22 is a true,
correct and complete list of all employees
employed at the Facilities (including admin-
istrators and supervisory personnel) together
with each such person's current rate of pay,
accrued vacation and sick days and other
accrued employee benefits…".[4] (E. 2).

The sale of Hamilton Park took place in or about April or
May of 2013. The Atrium was sold the same day in a separate
transaction. (Transcript 87-88).

According to the documentary evidence, Hamilton Park and
The Atrium were sold to the same entity.  The registered owner
for both of these facilities is Hamilton Park Opco, LLC.  The
Administrator for Hamilton Park is John Hoffman. The
Administrator for The Atrium is Marianne Alfano.  Uri Alfred
Kirschner is registered as the Officer for both Hamilton Park

---

[4] On October 9, 2017, I e-mailed David F. Jasinski, Esq.,
Katherine H. Hansen, Esq., and William S. Massey, Esq., Counsel
for the parties and informed them Schedule 4.22 referred to in
Exhibit No. 2 was not attached to the copy placed into evidence.
I requested they provide me with a copy. By e-mail dated October
9, 2017, the Union's Counsel, Hansen, informed me her copy of E.
2 did not contain Schedule 4.22. Thereafter, on November 3,
2017, Jasinski sent me an e-mail in which he stated he did not
have any of the schedules and could not provide them.

and The Atrium.  (Union Exhibit No. 17).  Kirschner also signed the Asset Purchase Agreement as the Managing Member of Hamilton Park Opco.  (Union Exhibit No. 2).

In July 2013, Confidence Management Services ("CMS") began managing the Housekeeping Department (which includes laundry) at both Hamilton Park and The Atrium. CMS signed an Assumption Agreement with the Union on July 1, 2013, in which CMS recognized the Union as the exclusive bargaining agent for all laundry and housekeeping workers employed by CMS at Hamilton Park. (Joint Exhibit No. 1). In addition, the Assumption Agreement required CMS employ all laundry and housekeeping employees who were then employed by Hamilton Park and that it would be bound by the 2008 Agreement. The Assumption Agreement does not specifically reference The Atrium. (Joint Exhibit No. 1).

Subsequent to the sale in the Spring of 2013, individuals employed at The Atrium in the Dietary, Housekeeping and Maintenance Departments no longer received benefits pursuant to the 2008 Agreement. For example, they no longer received vacation, sick days or personal days in accordance with the schedule set forth in the 2008 Agreement. Furthermore, welfare contributions and dues deductions were not being made on behalf of The Atrium employees.  (Transcript 213-215).

On August 26, 2013, the Employer noticed layoffs for the Dietary and Housekeeping Departments to be effective September 9, 2013.  The Union's request to postpone the layoffs was denied on September 5, 2013. (Union Exhibit No. 3).

On September 25, 2013, Roy Garcia, Union Vice-President, sent an e-mail to Jasinski in which Garcia referenced several issues including the proposed layoffs and the exclusion of The Atrium workers from the bargaining unit. In regard to The Atrium employees, the e-mail stated: "On 9/19 the Union said this was a grievance and is now following up in writing". (Union Exhibit Nos. 6 and 14).

By letter dated October 13, 2013, Union Counsel, Massey notified me in my capacity as the named contract arbitrator of a dispute between Hamilton Park and the Union concerning Hamilton Park's alleged violation of several provisions of the Agreement, including removing employees from the bargaining unit.  As a result of my receipt of the October 30, 2013, letter, I scheduled hearings in this matter.

On July 1, 2014, Hamilton Park filed a Unit Clarification Petition ("UC Petition") with the National Labor Relations Board, Region 22, ("NLRB") in which it sought a ruling from the NLRB The Atrium employees are not covered by the Agreement between the Employer and the Union.  (Union Exhibit No. 1).  On June 3, 2015, the NLRB informed the parties a determination had

9

been made to dismiss Hamilton Park's UC Petition.  (Union Exhibit No. 1).

Hearings were held before me on June 4, 2015, September 6, 2015, June 28, 2016, and July 11, 2017.  A stenographic record of the last two (2) hearing dates was taken.

At the hearing held before me on June 4, 2015, a number of issues raised by the Union in its letter dated October 13, 2013 were resolved. The dispute concerning Hamilton Park's alleged removal of The Atrium employees from the bargaining unit was not resolved. I ordered further hearings be held.

At the June 4, 2015, hearing, I directed the Employers to produce documents regarding the relationship between The Atrium and Hamilton Park no later than June 30, 2015. I also ordered the parties submit written pre-hearing submissions.

By e-mail dated June 23, 2015, the Union sent the Employer an e-mail with an attached Information Request.  (Union Exhibit No. 11). By e-mail dated July 1, 2015, the Employers served the Union with its response to the Information Request. The Employers stated additional information would be forthcoming.

By e-mail dated July 8, 2015, the Union informed me it had not gotten any further documents as per the Employers' e-mail dated July 1, 2015.  (Union Exhibit No. 11).

At the September 6, 2015, hearing the parties entered into numerous stipulations of fact.  The stipulations are as follows:

1. The Memorandum of Agreement dated July 1, 2013, between the Union and CMS was placed in evidence.  (Joint Exhibit No. 1).

2. The Agreement between the Union and Employer effective March 13, 2008, was placed in evidence.  (Joint Exhibit No. 2).

3. The Interest Arbitration Award dated November 7, 2012, was placed in evidence.  (Joint Exhibit No. 3).

4. The National Labor Relations Board deferred the issue of the bargaining unit to arbitration.  (Transcript 6).

5. There were separate administrators for the Atrium and Hamilton Park.  (Transcript 6).

6. There may be a dispute whether Mr. Amin Sanaia, Executive Administrator, at Hamilton Park, is superior to Ms. Marion Alfano, who is at The Atrium.  (Transcript 6).

7. The business card of Sanaia says Executive Administrator. (Transcript 6).

8. Tom Locentilo is the Director of Dietary and he covers both locations.  Locentilo schedules both locations, but prepares a separate schedule for each. (Transcript 6).

9. Raphael Donado is the Director of Housekeeping. He covers both locations. (Transcript 6).

10. Since at least 2009, dues were tendered to the Employer at the Atrium to remit to the Union, and the Atrium did so until October 2012.  After October 2012, one (1) check for dues was tendered to the Union by the prior owner.  (Transcript 7).

11. After the sale in March 2013, Hamilton did transmit dues for employees who worked some time at Hamilton. After the sale, dues were no longer deducted for employees who worked at The Atrium in the Dietary,

11

Maintenance and Housekeeping Departments.   (Transcript 7-8).

12.   The Union submitted authorization cards from Atrium employees in September of 2013.[5]  The names of the employees who submitted authorization cards are:

    a. Justin Bansil - he had tendered dues to the Union in 2011.
    b. Julius Calano - he tendered dues from at least 2009.
    c. Nanah Korama - dues were tendered by this employee but the date was not known.
    d. Sanga Kristen - dues were tendered in 2012.
    e. Quan Lanpley - dues were tendered for 2012 and 2013.
    f. Cristano Ramos Mislang - dues were tendered for 2009, 2010,2011, and 2012.
    g. Luz Perez- dues were tendered in 2012, 2011, and 2012.
    h. Shirley A. Williams - dues were tendered in 2011, 2012, and 2013.

    A letter from Union President George Gresham dated September 12, 2013, authorized dues for the above-named employees.

13.   The Welfare Fund in 2009 received separate checks from The Atrium and from Hamilton Park.  They were submitted from Hamilton Park Healthcare Center. This was done by the prior owner.

14.   Email from Elana Gonzalez from Hamilton Park Health Care Center to Martha Avery, Union Welfare Fund stating "…the Union employees from Atrium have been transfer[ed] to HPHHC effective 10/14/12.  You [are] going to receive a check from Atrium only for 10/01/2012; the rest of the month is include[d] in HPHHC from 10/14/2012 to 10/31/2012".  (See, Exhibit B of Union's September 14, 2015 submission).


On September 14, 2015, I received written submissions from

both the Union and the Employers. On October 1, 2015, the Union

---

[5] This stipulation was incorrectly referred to as Stipulation 11. All of the numbers that follow were adjusted accordingly by one (1) number.

filed an Unfair Labor Practice charge with the NLRB in which it alleged the Employers failed to provide documents as per my order issued at the June 4, 2015, hearing.

On February 24, 2016, the NLRB Regional Director of Region 22 issued two (2) separate complaints.  The cases were consolidated and tried on June 7, 2016.

On September 14, 2016, John T. Gianoplous, Administrative Law Judge ("ALJ Gianoplous"), issued a Decision and Order. ALJ Gianoplous ordered the Employers to produce documents pursuant to the Union's information request, which included employees who worked at The Atrium and Hamilton Park.

The Union served a subpoena on Mendy Gold, signed by me on June 17, 2016, which required him to appear at the June 28, 2016, arbitration hearing. (Union Exhibit No. 8).  The Union also served subpoenas on Locentilo, Dietary Director and Donado, Housekeeping Director, which I signed on June 22, 2016.  (Union Exhibit Nos. 9 and 10).  None of these individuals appeared at either the June 28, 2016, hearing or the hearing held on July 11, 2017. (Transcript 262-263).

At the hearings, the parties were afforded full opportunity to introduce evidence and argument in support of their respective positions.  They did so.  The record was deemed closed pending my receipt of written submissions and the final transcripts.

On October 2, 2017, the Union filed a post-hearing brief. The Union also requested I enter into evidence a document marked as Union Exhibit No. 18.  On October 3, 2017, the Employers filed their brief and objection to the admission of Union Exhibit No. 18.

On October 3, 2017, the Union filed a revised version of its previously filed post-hearing brief with the reference to Union Exhibit No. 18 being removed.  The Employers filed a reply brief on October 20, 2017, and the Union filed its reply on November 1, 2017.  At that time, I determined the record closed.

## DISCUSSION AND FINDINGS

**The Issues:**

The basic issues presented for determination are as follows:

1. Is the grievance arbitrable?

2. Did the Employers violate the Collective Bargaining Agreement by removing dietary, maintenance and housekeeping work performed at The Atrium from the bargaining unit?

3. If so, what shall be the remedy?

<u>Relevant Contractual Provisions</u>

<u>2005 - Agreement</u>

<u>Attachment A - Employees</u>

    Arnold Walter Nursing Home
    Atlantic Coast Rehabilitation
    Avante at Red Bank
    Burnt Tavern Rehabilitation and Health Care Center
    Cedar Oaks Care Center
    Clark Nursing and Rehabilitation
    Cranford Health and Extended Care
    Crystal Lake Health Care
    Dellridge Care Center
    Hamilton Park Health Care Center, including the Atrium
    King Manor Care Center
    Leisure Chateau Care Center
    Liberty House Nursing Center
    New Visor Manor
    Newark Extended Care Facility
    Plaza Rehabilitation and Nursing Center
    Raritan Health and Extended Care
    Regency Gardens Nursing Center
    Woodcliff Lake Manor Care Center

<u>2008- Agreement</u>

<u>Article 11 - Grievance and Arbitration Procedure</u>
11.1  For the Purpose of this Agreement, a grievance shall be defined as a dispute with regard to the application, interpretation or performance of an express term or condition of the Agreement.

11.2  A grievance may be filed only by the Union, or the Employer and must be filed pursuant to the following:

    <u>STEP 1:</u>   A designated Delegate may file a grievance on behalf of an employee or group of employees by submitting the grievance in writing to the Employer's department head of his designee. Said grievance must be submitted within thirty (30) calendar days after the employees, by use of reasonable diligence, should have been aware of the facts and circumstances of the occurrence.  The department head or his/her designee shall respond to the grievance within seven (7) calendar days after its presentation.

STEP 2:    If the grievance is not satisfactorily adjusted in "Step 1" or if his/her department head or designee does not respond within seven (7) calendar days, then the Union shall present the grievance to the Employer's administrator, in writing, on the grievance form within seven (7) calendar days from the date the Employer's response would have been due.

The Administrator shall respond within seven (7) calendar days after its presentation.

## Article 27 – CONTRACTING OUT

It is agreed between the parties that for the preservation of the work opportunities of the employees within the collective bargaining unit covered by this Agreement, the Employer shall not subcontract out any of the bargaining unit work of employees covered by this Agreement without the prior written consent of the Union.  Such consent shall not unreasonably be withheld.  If the Union grants permission, any contract or Agreement between the Employer and a contract employing employees of the Employer shall, with respect to the affected employees, comply with all terms and conditions if this Agreement, and the Employer guarantees the performance thereof by the contractor.

## Article 32 – Parties

This Agreement shall be binding upon the parties hereto, their successors and assigns, and shall apply to all establishments now or hereafter owned, operated, or controlled by the Employer.  If the Employer shall sell, transfer, or otherwise dispose in whole or in part of its business, merge or consolidate it with that of any other person, firm or corporation, the Agreement by which such sale, transfer, assignment, subletting, disposition, merger or consolidation is made must prove that the person, firm or corporation thereafter to operate the business shall employ all employees then employed in the business; that the person, firm or corporation that thereafter operates the business shall be personally responsible for all unpaid wages, all fund payments; vacations, holidays, sick leave and all other monetary items. The Employer shall give prior notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc of the operation covered by this Agreement, or any part thereof. Such notice shall be in writing and a copy served upon the Union at the time

the seller, transferor or lessor executes a contract or
transaction as herein described. The Union shall also be advised
of the exact nature of the transaction, excluding financial
details.  In the event the Employer fails to require the
purchaser, transferee or lessee to assume the obligations of
this Agreement, the Employer shall be liable to the Union and
the employees covered, for all damages sustained as a result of
such failure to require assumption of the terms of this
Agreement.  Any dispute whatsoever kind or nature arising under
this Article shall be subject to the arbitration procedure
herein, and the Arbitrator has jurisdiction to determine the
same and issue a decision awarding any sums of money and
damages.

Attachment A – Signatory Employees

- Atlantic Coast Rehabilitation Center
- Cranford Health and Extended Care
- Crystal Lake Health Care
- Dellridge Care Center
- Hamilton Park Health Care Center
- King Manor Care Center
- Leisure Chateau Care Center
- Liberty House Nursing Center
- Raritan Health Health and Extended Care
- Woodcliff Lake Manor Care Center

## Relevant Provisions of Asset Purchase Agreement

WHEREAS, the Seller Hamilton Park Care Center, Ltd
owns and operates a 260 bed long term care facility located at
525 Momouth Street, Jersey City, New Jersey and commonly known
as the Hamilton Park Health Care Center (the "LTC Facility"; and

ARTICLE I

1.1  Sale and Purchase of Assets.  Subject to the
terms and conditions of this Agreement and on the basis of and
in reliance upon the representations, warranties, Obligations
and agreements set forth herein, on the Closing Date (as such
term is hereinafter defined), the Seller shall validity sell,
assign, transfer, convey and deliver to the Buyer, and
the Buyer shall purchase and acquire, all of the right, title
and interest of the Seller in, to and under all of the assets of
the Seller in, to and under all of the Seller which constitute
or relate to the Facilities and/or the Operation thereof
tangible or intangible, of every kind and description (other

17

than the Excluded Assets, as hereinafter defined), including without limitation, the following collectively, "Assets").

4.22.    Employees; Employee Benefit Plans. Attached hereto as Schedule 4.22 is a true, correct and complete list of all employees employed at the Facilities (including administrators and supervisory personnel) together with each such person's current rate of pay, accrued vacation and sick days and other accrued employee benefits Schedule 4.22 further contains a true and complete list of all pension, Profit sharing retirement, deferred compensation, stock purchase, stock option, incentive, bonus, vacation, severance, disability, hospitalization, medical insurance, life insurance, and other employee benefit plans, programs or arrangements, maintained by the Seller or under which the Seller has any obligations (other than obligations to make current wage or salary payments) in respect of, or which otherwise cover, any of the current or former employees of the Facilities, or their beneficiaries (hereinafter individually referred to as a "Plan" and collectively referred to as the "Plans"). The Seller shall forthwith deliver to the Buyer true and complete copies of all documents, as they may have been amended tithe date thereof, embodying or relating to the Plans, but Buyer will not assume/take over the Plans.

9.5   Employees and Other Relations.  Buyer and Seller agree that buyer will assume the CBA and be subject to all of the rights and obligations of the CBA, allowing the Buyer to effectively step into the hoes of the Seller with respect to Sellers rights and obligations under the CBA, including but not limited to Buyers obligation to retain all of the employees, be personally responsible for all unpaid wages, all fund payments, vacations, holidays, sick leave and all other monetary items (the "CBA Requirements").

11.4 Facilities Employees
(a)  As or the Closing Date, the Seller shall pay, or provide Buyer with an adjustment in Buyer's favor for, all accrued salary and wages (including all taxes and withholdings) for all the Employees employed at the Facilities as of the Closing Date, (other than the Employee Benefits Amount as provided in Section 1.3 above). As of the Closing Date, the Buyer shall be free to offer to hire any or all of the employees employed at the Facilities; it being understood and agreed that (i) the Buyer shall be free to set its own terms and conditions of employment for any employee it seeks to hire and to limit its hiring of those to whom it, in its sole discretion, deems

**capable of performing to its standards and (ii) neither this Section nor any other provision of this Agreement nor the consummation of the transaction description herein shall constitute the agreement of the Buyer to assume or be bound by the terms and conditions of any collective bargaining agreement or trust agreement to which Seller may be a party.**

## Positions of the Parties

Initially, the Employers argue the grievance is not arbitrable.  The Employers insist the Union did not file a timely grievance. The Employers also argue, even if I find the Union filed a timely grievance, it was not filed in the proper form as required by the Agreement.

According to the Employers, the grievance occurred on October 15, 2012, when approximately fifteen (15) employees from The Atrium payroll were transferred to the Hamilton Park payroll.  The Employers argue any dispute the Union may have had with respect to the proper classification of these employees was triggered on October 15, 2012.

The Employers cite to Article 11.2 of the Agreement which states in pertinent part:

> 11.2 A grievance may be filed only by the
>      the Union, or the Employer, and must
>      be filed pursuant to the following
>      procedure:
>
> **STEP 1:**  A designated Delegate may file a
> grievance on behalf of an employee or group of
> employees by submitted the grievance in writing
> to the Employer's department head or his designee.

> Said grievance must be submitted within thirty (30)
> calendar days after the occurrence of the alleged
> violations of this Agreement or within thirty (30)
> calendar days after the employees, by use of reasonable
> diligence, should have been aware of the facts and
> circumstances of the occurrence….

The Employers contend since the Union's position is that it filed the grievance on September 25, 2013, (Union Exhibit No. 6), it is well beyond thirty (30) days from October 15, 2012, and, therefore, it is untimely.

In the alternative, the Employers argue the e-mail the Union maintains is the grievance it filed, even if timely, was not filed or presented to a proper employer representative. In support of this position the Employers rely on the following language in Article 11.2 of the Agreement:

> **STEP 2:**  If the grievance is not satisfactorily
> adjusted in "Step 1" or if his/her department
> head or designee does not respond within seven (7)
> calendar days, then the Union shall present the
> grievance to the Employer's administrator, in writing,
> on the grievance form within seven (7) calendar days
> from the date the Employer's response would have been
> due.

The Employers insist the e-mail sent by the Union dated September 25, 2013, does not amount to a "grievance form" as required by Article 11.2 of the Agreement.  The Employers argue the e-mail represents nothing more than a list of concerns the Union had and does not amount to a formal grievance.

As well, the Employers maintain the Union sent the grievance to Hamilton Park's Counsel, rather than to an administrator, as required by Article 11.2 of the Agreement. The Employers insist the grievance is procedurally defective and, therefore, must be dismissed. In support of their position, the Employers cite *Philadelphia Printing pressman's Union No. 16, Aniline v. International Paper Co.,* 648 F.2d 900 (3d Cir. 1981), (the Court rejected the union's position a written grievance was a mere formality that could be unilaterally dispensed with and held the union may not skip the grievance machinery set forth in the collective bargaining agreement).

The Employers further insist if I accept the Union's grievance as being properly filed I would be violating Article 11.5 of the Agreement which states as follows:

> **The Arbitrator may not add to, substract from, or otherwise amend or modify the terms of this Agreement.**

In short, the Employers argue the Union's grievance is procedurally defective and, therefore, not arbitrable.

As to the merits, the Employers argue The Atrium has never been a "Signatory Employer" to an agreement with the Union and, therefore, individuals employed by The Atrium cannot be included in the Hamilton Park bargaining unit. The Employers insist the

2005 Agreement identifies Hamilton Park as the Employer. Further, the Adoption Memorandum signed by each Employer to the 2005 Agreement identifies Hamilton Park as the Employer. The Employers maintain The Atrium was never identified as one of the Employers to the 2005 Agreement. (Union Exhibit No. 2).

The Employers insist the list of Signatory Employers in Attachment A of the 2005 Agreement, which refers Hamilton Park "including The Atrium", is not controlling. (Union Exhibit No. 2). The Employers argue the reference to The Atrium was then removed from Attachment A in the 2008 Agreement. (Joint Exhibit No. 2).

As well, the Employers argue the interest arbitration award I issued on November 7, 2012, identified Hamilton Park as one of the employers under the "Tuchman Homes". According to the Employers, The Atrium was never identified as one of the employers. (Joint Exhibit No. 3).

The Employers maintain Hamilton Park and The Atrium do not constitute a single employer. According to the Employers, Hamilton Park and The Atrium are separate corporate entities operating two (2) different types of businesses, they have different addresses and separate entrances. (Transcript 256). The Employers argue other indications the two (2) entities do not constitute a single employer are they have separate

22

administrators, separate time clocks and separate work
schedules.  (Transcript 250).

The Employers maintain the Union's witnesses confirmed The
Atrium is a separate entity from Hamilton Park.  They argue
there are insufficient contacts to find the employees of The
Atrium should be bound by an Agreement their employer never
signed.

According to the Employers, Union witness Perez admitted
The Atrium employees who perform housekeeping services work at
The Atrium a majority of the time and that no one was
transferred on a permanent basis between Hamilton Park and The
Atrium.  (Transcript 241-242).  The Employers also cite the
testimony of Kenneth Tomlin, a Hamilton Park employee, who
stated he would occasionally be assigned to perform maintenance
work at The Atrium.  (Transcript 243).  Tomlin never punched in
at The Atrium.  (Transcript 243).

As well, the Employers argue the cases the Union relies
upon in support of its "single employer" theory are based upon a
determination by the NLRB and not an arbitrator.  Therefore, the
Employers insist the issue is not one for an arbitrator to
decide.

The Employers maintain the Asset Purchase Agreement clearly establishes Hamilton Park and The Atrium are separate entities which were sold in separate transactions. (Employers' Exhibit No. 4). The Employers rely upon the "Whereas clause" which states as follows:

> **WHEREAS**, the Seller Hamilton Park Health Care Center, Ltd owns and operates a 260 bed long term care facility at 327 9th Street, Jersey City, New Jersey and commonly known as the Hamilton Park Health Care Center (the "LTC" Facility) And an adjacent parking lot ("Parking Lot").

> **WHEREAS**, the Seller desires to sell the LTC (hereinafter referred to as the Facilities).

According to the Employers, the Asset Purchase Agreement clearly indicates it did not include the sale of The Atrium.

The Employers urge if the Union believed The Atrium was covered by the Agreement it would have named The Atrium in the lawsuit which sought to enjoin the sale of Hamilton Park. The Union would have also included The Atrium in the Consent Order. (Union Exhibit No. 7). The Employers argue it did neither.

As well, the Employers insist the Memorandum of Agreement ("MOA") between the Union and CMS dated July 1, 2013, supports their position The Atrium employees are not properly included in the bargaining unit. The Employers contend the following language is controlling:

24

> **Employer recognizes the Union as the sole and exclusive bargaining agent for all full-time laundry and housekeeping employees employed by the Employer at Hamilton Park Healthcare Center. (Employers' Exhibit No. 1).**

The Employers insist there is no mention of The Atrium.

The Employers also allege there would have been no need for the Union to forward nine (9) Union authorization cards from The Atrium employees to the Administrator of Hamilton Park on September 12, 2013, if they were previously included in the bargaining unit. These cards authorized the deduction of initiation fees as well as dues. According to the Employers, the Union has only new members sign authorization cards requiring initiation fees.

In short, the Employers insist I find the Union's grievance not arbitrable because the Union failed to file a timely a grievance as required by the 2008 Agreement. In the alternative, the Employers argue the grievance should be dismissed on the merits in that Hamilton Park and The Atrium are not a single employer for purposes of collective bargaining and, therefore, The Atrium employees are properly excluded from the Hamilton Park bargaining unit. The Employer also insist the only remedy I can order is that the Employers cease and desist from utilizing non-bargaining unit employees and to cease and desist from

providing labor to The Atrium which is not covered by the Agreement.

The Union, on the other hand, argues the grievance is properly before me. The Union insists the Employers' claim the grievance is not arbitrable because it is untimely should be deemed waived. According to the Union, the Employers first raised this issue at the June 28, 2016, hearing, almost three (3) years after the Union filed the grievance on September 25, 2013. As a result, the Union contends the Employers waived the right to argue the grievance was not filed in a timely manner.

The Union maintains even if the issue of arbitrability is properly before me, its grievance was filed in accordance with the 2008 Agreement. Contrary to the Employers, the Union claims the grievance arose on August 26, 2013, when the Employers noticed layoffs for the Dietary and Housekeeping Departments to be effective September 9, 2013. It argues its grievance filed on September 25, 2013, (Union Exhibit No. 6) is within the thirty (30) day filing period set forth in Article 11.2 of the 2008 Agreement. (Joint Exhibit No. 2).

According to the Union, the Employers have no basis to assert Jasinski was not authorized to receive the grievance. The Union further argues since a copy of the grievance was sent

to Sue Roman, Hamilton Park's former Administrator, it complied with the requirement set forth in Article 11.2 which states "the Union shall present the grievance to the Employer's administrator…".

The Union insists the Employers' bare assertion an e-mail is not an acceptable form in which to file a grievance is entitled to no weight and clearly erroneous.  The Union maintains the Employers introduced no evidence as to what the parties considered to be a "proper form" of a grievance.  As well, the Union argues no evidence was offered regarding the parties' past practice in regard to this issue.

The Union's position is that *Philadelphia Printing Pressman's Union No. 16, Aniline v. International Paper Co.,* 684 F. 2d 900 (3d Cir. 1981), does not support the Employers' position.  The Union points out *Philadelphia Printing* did not involve the arbitrator's ruling concerning arbitrability.  Further, no writing in any form was filed.

In short, the Union maintains the grievance is arbitrable and seeks a ruling on the merits.

As to the merits, the Union argues the work performed in the Housekeeping, Dietary and Maintenance Departments at The Atrium must be included in the bargaining unit as defined in the

2008 Agreement. According to the Union, the evidence presented demonstrates s that prior to the 2013 sale, the 2005 and 2008 Agreements covered the work performed at The Atrium by employees in these Departments. The Union maintains employees performing this work were members of the Union and received all of the benefits provided for in the Agreements. (Union Exhibit Nos. 3, 4, 5).

The Union insists The Atrium is not a separate entity for purposes of collective bargaining. It argues Hamilton Park and The Atrium are a single employer.

The Union contends the explicit language in the 2005 Agreement established the intent of the parties to apply the terms of the 2005 Agreement to The Atrium. It argues the list of the "Signatory Employers" to the 2005 Agreement specifically includes "Hamilton Park Health Care Center, including The Atrium". (Union Exhibit No. 2). The Union insists The Atrium employees must be included in the bargaining unit.

The Union further argues the fact that the specific reference to The Atrium was not included in the 2008 Agreement is of no consequence.  The Union contends omission of the reference to The Atrium in the 2008 Agreement was merely a scrivener's error. The Union maintains the parties considered such a reference superfluous, since The Atrium employees were,

in fact, included in the bargaining and continued to enjoy the benefits of the 2008 Agreement up until the sale in 2013.

According to the Union, Hamilton Park and The Atrium continued to remit Union dues and make health fund payments to the 1199SEIU Greater New York Benefit Fund as well as the 1199SEIU Greater New York Education Fund on behalf of the bargaining unit employees during the period covered by the 2008 Agreement and the 2012 Interest Arbitration Award.  (Union Exhibit Nos. 3, 4, 5).  The Union claims up until October 2012, Hamilton Park and The Atrium sent separate checks to the Union and to the Funds.  However, according to the Union, the checks sent by Hamilton Park and The Atrium were all signed by the prior owner, Lorraine Mocco, and jointly remitted by Hamilton Park. (Union Exhibit Nos. 3, 4, 5).

The Union insists the fact The Atrium employees were transferred to Hamilton Park's payroll in October 2012, is a clear indication the Employers considered those employees to be included in the bargaining unit. (Union Exhibit No. 3). The Union argues after the effective date of the payroll transfer, October 14, 2012, Union dues and contributions to its Funds on behalf of employees working at Hamilton Park and The Atrium continued to be paid and were remitted in one (1) check sent by Hamilton Park. (Union Exhibit Nos. 3, 4, 5).

29

The Union maintains the documentary evidence and testimony clearly established Hamilton Park and The Atrium are sufficiently integrated business operations as to be deemed a single employer for purposes of collective bargaining. According to the Union, it established Hamilton Park and The Atrium had one (1) common owner prior to the 2013, Mocco.

The Union insists the Asset Purchase Agreement between Hamilton Park and Hamilton Park Opco dated March 4,2013, included The Atrium Dietary, Housekeeping and Maintenance employees.  (Employers' Exhibit No. 2). The Union argues The Atrium was sold to Hamilton Park Opco on the same day Hamilton Park was sold.  In support of this position the Union relies upon the statement of Jasinski at the hearing held on June 28, 2016.  (Transcript 87-88).

The Union points out throughout the Asset Purchase Agreement there are references to "Facilities".  The Union cites to the reference in Article 1.1 to assets "which constitute or relate to the Facilities".  Further Article 2.1 refers to the "conveyance and delivery of the Facilities' Assets by the Seller to the Buyer,…".  The Union emphasizes Article 4.20(b), which states in pertinent part:

> **(b)  …('Facilities' includes the building in which they are  operated and the land upon which the building is located) …. (E. 2).**

The Union maintains the record establishes Hamilton Park and The Atrium are located in the same building.  (Union Exhibit No. 17, Transcript 254-255).

According to the Union, Hamilton Park Opco purchased Hamilton Park and The Atrium from the same seller.  It maintains the only registered owner for both facilities is Hamilton Park Opco, which is part of the Alaris Health network, (Union Exhibit Nos. 16 and 17) and the only registered Officer/Principal for both Hamilton Park and The Atrium is Kirschner.  (Union Exhibit No. 17).  Kirschner signed the Asset Purchase Agreement on behalf of Hamilton Park Opco in 2013.  (Employers' Exhibit No. 2).

As well, the Union contends the unrebutted testimony establishes Hamilton Park and The Atrium, even after the sale in 2013, remained a "single employer" for purposes of collective bargaining.[6] The Union maintains there is one (1) Dietary Department, Housekeeping Department and Maintenance Department for both Hamilton Park and The Atrium.

The Union notes CMS employs all housekeeping personnel (including laundry) who work at Hamilton Park and The Atrium. The Union argues the three (3) housekeeping employees who testified at the arbitration established there is only one (1)

---

[6] The Employers did not call any witnesses during this arbitration proceeding.

Director of Housekeeping, Donado, for both Hamilton Park and The Atrium and he performs the scheduling for both. (Stipulation 9, Transcript 215). In addition, they testified since the 2013 sale, employees are still regularly assigned to work at both facilities. (Transcript 211-212, 215-226). An employee is required to punch in at his or her regularly assigned work location even if they perform work on the other side of the building and they are paid in the same check for all work performed regardless whether they performed work at both locations. (Transcript 225-226).

The Union contends the Dietary Department functions in a similar manner. There is a one (1) Director, Locentilo, who oversees dietary at both Hamilton Park and The Atrium. Locentilo does the scheduling for both facilities. (Stipulation 8). According to the Union, in some cases there is a single schedule for both Hamilton Park and The Atrium. (T. 119-120). The Union insists while individuals employed in the Dietary Department are assigned to either Hamilton Park or The Atrium, they regularly work at both facilities. (T. 117-118, 128).

The Union notes there is only is one (1) supervisor, Miquel Espaillat, for the Maintenance Department who is responsible for both Hamilton Park and The Atrium. Eugene Shapiro is the Director Maintenance for both facilities. (Transcript 244, 250). According to the Union, employees regularly perform

32

maintenance work at both Hamilton Park and The Atrium. (Transcript 248).

The Union maintains the unrebutted facts establish the business operations at Hamilton Park and The Atrium are sufficiently integrated as to constitute a "single employer" for purposes of collective bargaining. *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255 (1965); *N.L.R.B. v. Browning-Ferris Industries of Pennsylvania,* 691 F.2d 1117, 1122 (3d Cir. 1982); *Bolivar-Tees, Inc.,* 349 NLRB 720 (2007).

The Union contends the factors used to establish a single employer relationship are present in this case.  Those factors are the interrelation of operations, common management, centralized control of labor relations and common ownership. *Mobile, 380 U.S. at 256; Bolivar-Tees,* 349 NLRB at 720; *United Contractors Inc.,* 220 NLRB 463 (1975).

The Union argues the four (4) factor test is easily met in this instance.  As to interrelations of operations, it insists there is only one (1) Housekeeping, Dietary and Maintenance Department that covers both Hamilton Park and The Atrium.  The function of scheduling at both facilities is performed by one (1) person and employees regularly work at both facilities.

According to the Union, there is a single director for each department, constituting common management.  Third, there is

centralized labor relations in the form of a single human resources department.  Fourth, the common ownership of the two (2) facilities that existed before the 2013 sale, continues as of today.  As a result, the Union insists The Atrium employees must be included in the bargaining unit and are entitled to the benefits set forth in the 2008 Agreement, as extended by my 2012 Interest Arbitration Award.

Further, the Union argues the decision of the NLRB provides no support for the Employers' position The Atrium employees not be included in the Hamilton Park unit.  According to the Union, the only issue before ALJ Gianoplous in that proceeding was whether the Employers violated the National Labor Relations Act ("NLRA") by refusing to produce certain information requested by the Union.  The Union maintains the NLRB specifically found it "unnecessary to pass on his [ALJ's] findings that The Atrium employees are not included in [the] collective-bargaining unit…".

The Union argues the Employers' reliance on *South Praire Construction Co., v. Local No. 627,* 425 U.S. 800 (1976), for the proposition the NLRB has exclusive jurisdiction over all issues involving representation and appropriate scope of the bargaining unit is misplaced.  The Union maintains *South Praire Construction* did not address an arbitrator's authority to determine the scope of a bargaining unit.  It also argues in

34

that case the federal court, not the NLRB, determined single-employer status, which contradicts the Employers' position, here, that only the NLRB can make such a determination.

As well, the Union insists the only appropriate remedy is to apply the terms of the Agreement to The Atrium employees in the form of a make whole remedy. The Union insists any remedy short of a make whole remedy, such as a cease and desist order as suggested by the Employers, would be inappropriate.

In summary, the Union argues the grievance dated September 25, 2013, is timely and properly before me. It insists the Employers and The Atrium are a single employer for purposes of collective bargaining. As a result, the Union asks for a determination The Atrium employees in the Dietary, Laundry and Maintenance Departments are entitled to receive all of the benefits set forth in the Agreement and, such employees, are within the applicable bargaining unit.


## Opinion

Certain preliminary comments are appropriate. As an arbitrator, my role is a limited one. It is to interpret the parties' agreement as written. If the agreement is clear on its face and from the parties' chosen words their intentions are manifest, then I am without power or authority to deviate from those intentions. Rather, if the contract language is clear and

35

consistent, I must enforce the contract according to the plain meaning of the parties' language. In addition, I must interpret the agreement to give effect to all provisions and to avoid nullifying language adopted by the parties.

With these principles in mind, I turn to the facts presented.

Upon my careful consideration of the evidence and arguments presented, I find the Union's grievance dated September 25, 2013, is properly before me. I also find the Employers violated the 2008 Agreement as extended by the 2012 Interest Arbitration Award by removing dietary, maintenance, and housekeeping work performed at The Atrium from the bargaining unit.

Where the Agreement contains a broad arbitration clause a presumption of arbitrability attaches. This is a fundamental principle of arbitrable jurisprudence. As well, the party challenging arbitrability has the burden of proof.

The issue of arbitrability was first raised by the Employers at the June 28, 2016, hearing. (Transcript 23). Contrary to the Union's position, I do not find the Employers waived this argument merely because it was not raised earlier in the proceeding.

Article 11 of the Agreement provides a grievance must be submitted, in writing, within thirty (30) calendar days after the occurrence which gave rise to the grievance or "within

36

thirty (30) calendar days after the employees, by use of reasonable diligence, should have been aware of the facts and circumstances of the occurrence". The Employers contend the grievance occurred on October 14, 2012, the effective date of the transfer of The Atrium employees to the Hamilton Park payroll.

I do not find October 14, 2012, to be the date the grievance arose. On that date The Atrium employees were merely transferred from The Atrium payroll to the Hamilton Park payroll. The evidence establishes the Employers continued to apply the terms of the 2008 Agreement to The Atrium employees and continued to remit dues and Fund payments on behalf of The Atrium after October 14, 2012. The only change was the method of payment from separate checks issued by The Atrium and Hamilton Park, to one (1) check sent by Hamilton Park. (Union Exhibit No. 3). I find under those circumstances, neither the employees nor the Union were on notice as of October 14, 2012, of any contract violation which would have started the clock for the filing of a grievance. Frankly, as of that date, no employee of The Atrium was assigned.[7]

---

[7] This is not to say the Union was precluded from grieving the transfer of payment responsibility. Clearly, it could have done so. However, under the facts presented, there was no obligation for the Union to complain at that point or risk later being accused of failing to file.

At the June 28, 2016, hearing I requested Jasinski provide the date when the Employers assert the dietary, housekeeping, and maintenance work ceased being performed by employees represented by the Union. The written response is contained in a letter dated July 12, 2016, which states as follows:

> **The layoffs at Hamilton Park Healthcare Center for dietary and housekeeping departments were noticed on August 26, 2013, with effective date of September 9, 2013. Despite requests to postpone the layoffs. The request was denied on September 5, 2013.   (Employers' Exhibit No. 3).**

Thus, at the earliest, the grievance arose on August 26, 2013, the date of the notice. In fact, a reasonable argument could be made the crucial date was September 9, 2013, when the layoffs were to be effectuated. After all, between August 26, 2013, and September 9, 2013, The Atrium could have changed its decision. In any event, I find the Union's e-mail dated September 25, 2013, which was sent within thirty (30) days of the August 26, 2013, notice, satisfied the requirements set forth in Article 11 of the Agreement.

The e-mail dated September 25, 2013, constituted a writing which put the Employers on notice the Union was filing a written grievance in response to the Employers' claim The Atrium employees were not in the Union.   In fact, the e-mail specifically stated it was being sent as a written grievance. (Union Exhibit No. 6, Union Exhibit No. 14).   I find no basis in

the record evidence to conclude the e-mail did not constitute a
grievance simply because it was not filed on an official
grievance form.

   After all, the Employers did not introduce any evidence to
establish a particular grievance form was always used by the
parties.  Nor is there any testimony offered regarding the
parties' practice as to what was an acceptable form for a
written grievance.  I conclude since the written e-mail clearly
stated it was a grievance, and identified the dispute, it was
properly filed in accordance with Article 11 of the Agreement.
I also find since the September 25, 2013, e-mail, though
addressed to Jasinski, also was sent to an Administrator. That
meets the requirement set forth in 11.2 of the Agreement.

   Having found the matter arbitrable, I turn to the merits of
this case.  After having evaluated the evidence and arguments
presented, I conclude the position proffered by the Union is the
correct one. I find the Employers violated the 2008 Agreement,
as extended by my 2012 Interest Arbitration Award, by removing
dietary, maintenance, and housekeeping work performed at The
Atrium from the bargaining unit.

   It is clear from the record prior to sale in 2013, The
Atrium employees received the benefits provided in the 2005
Agreement. The Atrium employees were covered by the 2005
Agreement as it specifically referred to the Employer as

"Hamilton Park Health Care Center, including The Atrium". (Union Exhibit No. 2).

Hamilton Park continued to provide The Atrium employees with Union benefits during the term of the 2008 Agreement, as extended by my 2012 Interest Arbitration Award, notwithstanding the fact the reference to The Atrium was omitted from the list of Employers found in Attachment A of that Agreement. (Joint Exhibit No. 2). The limited documentary evidence the Union was able to obtain from the Employers established Hamilton Park and The Atrium remitted separate checks for Union dues and payments to the Union Welfare Fund and Education Fund up until October 14, 2012. (Union Exhibit Nos. 3, 4 and 5).[8] These checks were signed by the same individual, Lorraine Mocco. (Union Exhibit No. 4).

The Employers did not dispute the Union's contention, prior to the 2013, Hamilton Park and The Atrium were treated as a

---

[8]At the hearing held before me on June 4, 2015, I directed the Employer to produce documents no later than June 30, 2015, regarding the relationship between Hamilton Park and The Atrium. On July 16, 2015, I again directed the Employers to produce the relevant documents. The Employers failed to produce the documents and the Union, on October 1, 2015, filed an Unfair Labor Practice with the NLRB. The NLRB issued a complaint and a hearing on the charges was held before an ALJ on June 7, 2016. On September 14, 2016, the ALJ held that the Employers' failure to produce the requested documents violated the NLRA. The NLRB affirmed the ALJ's decision. (See, Exhibit A of the Union's post-hearing brief). Notwithstanding the NLRB decision, the Employers did not fully comply with my order to produce documents requested by the Union.

single employer for purposes of collective bargaining.
During that time period Mocco was the owner of both facilities.
(Union Exhibit Nos. 5, E. 2). Prior to the 2013 sale, there was
one (1) Director of the Dietary, Housekeeping and Maintenance
Departments for both Hamilton Park and The Atrium. (Transcript
115). For each of those Departments, there was one (1)
supervisor and one (1) person who prepared the work schedule.
(Transcript 102-105, 115). Furthermore, employees in these three
(3) Departments regularly worked at both Hamilton Park and The
Atrium. (Transcript 102-103, 111, 116, 212).

　　As of October 14, 2012, The Atrium employees were
transferred to Hamilton Park's payroll. However, The Atrium
employees continued to receive Union benefits up until the April
2013 sale. (Union Exhibit No. 3).

　　Perez, who has been working at The Atrium since 2009,
credibly testified she received the Union benefits such as
health insurance, vacation, pension contributions, sick days and
personal days from the time she commenced her employment until
the Spring of 2013. (Transcript 213). After the 2013 sale, Perez
no longer received those benefits. (Transcript 215).


　　The evidence clearly establishes even after the 2013 sale,
the operative facts did not change. As such, I find the single
employer relationship between Hamilton Park and The Atrium that

existed prior to the 2013, continues to exist for purposes of collective bargaining.

Contrary to the Employers' contention, the Asset Purchase Agreement between Hamilton Park Opco, LLC and Hamilton Park Health Care Center, LTD., lends support to the Union's position the employees working at The Atrium should continue to be included in the bargaining unit. (Employers' Exhibit No. 2). Throughout the Asset Purchase Agreement there are references to the sale and conveyance of "Facilities", not one (1) facility.

Article 4.20(b) states in pertinent part:

> **('Facilities' includes the building in which they are operated and the land upon which the building is located).**

Since Hamilton Park and The Atrium were located in the same building, the language expresses an intent to include more than one (1) facility, which in this case, would be Hamilton Park and The Atrium.  (Transcript 255, Union Exhibit No. 17).

The Employers argue the parties did not intend the references to "Facilities" throughout the Asset Purchase Agreement to mean anything other than one (1) facility.  In support of its position the Employers maintain Hamilton Park and The Atrium were sold in separate transactions.

However, the Employers did not submit any documentary evidence or testimony to support this position. The Employers did not offer any direct testimony during this entire

42

proceeding. As well, the Employers did not comply with various
witness subpoenas the Union served, including a subpoena for
Mendy Gold, who the Union represented to be an officer or
principal of Hamilton Park.   (Transcript 79).

In my capacity as an Arbitrator, I draw an adverse
inference from the Employers' failure to produce a witness
within its power to produce and who should have been appeared.
I am particularly troubled by the lack of testimony by one (1)
of the Employers' officers or principals to explain the sale of
Hamilton Park and The Atrium in 2013.
Without the benefit of any testimony on behalf of the Employers,
I am left with the unrebutted testimony and documentary evidence
submitted by the Union.

Article 4.22 of the Asset Purchase Agreement provided in
pertinent part as follows:

> **Attached hereto as <u>Schedule 4.22</u> is a true,
> correct and complete list of all employees employed
> at the Facilities (including administrators and
> supervisory personnel) together with each such
> person's current rate of pay, accrued vacation and
> sick days and other accrued benefits….**

Obviously, Schedule 4.22 could have shed light on the
issues before me. After all, there is no dispute as of October
14, 2012, employees who worked at The Atrium were transferred to
the Hamilton Park payroll and continued to receive the benefits

provided in the Agreement, including remittance of Union dues and welfare payments.  (Union Exhibit Nos. 3, 4 and 5).

I find as of October 14, 2012, The Atrium employees, who were then placed on the Hamilton Park payroll, continued to be included in the bargaining unit. It is logical to assume these employees would have been included on the list of employees in Schedule 4.22 of the Asset Purchase Agreement.  If they were included on the list it certainly would have been a relevant factor in deciding this case since the buyer was required to retain all of Hamilton's employees.

However, despite my request, the Employers did not produce Schedule 4.22. Jasinski stated in an e-mail to me on November 3, 2017, he did not have any of the schedules attached to the Asset Purchase Agreement. Nor was any evidence produced to explain its absence. The absence of the requested documents and the failure to explain that absence, forces me to draw another adverse inference against the argument The Atrium employees are not included the bargaining unit.

Article 9.5 of the Asset Purchase Agreement states in part as follows:

> **Buyer and seller agree that Buyer will assume the CBA and be subject to all of the rights and obligations of the CBA, allowing the Buyer to effectively step into the shoes of the Seller with respect to the Sellers rights and obligations under**

44

**the CBA, and specifically article 32 of the CBA, including but not limited to Buyer's obligation to retain all of the employees, be personally responsible for all unpaid wages, all fund payments, vacations, holidays, sick leave and all other monetary items (the 'CBA Requirements').**

The MOA between CMS and the Union dated July 1, 2013, also required CMS to employ all laundry and housekeeping employees who were then employed by Hamilton Park. CMS agreed to "be bound by all rights, obligations, terms and conditions set forth in the current CBA between the Union and Hamilton Park Healthcare Center". (Joint Exhibit No. 1).

Based upon the successor language contained in Article 32 of the 2008 Agreement, the Asset Purchase Agreement and the MOA between CMS and the Union dated July 1, 2013, I find the dietary, housekeeping, laundry and maintenance employees who worked at The Atrium were employed by Hamilton Park for purposes of collective bargaining. I conclude the Employers violated the 2008 Agreement, when they improperly removed The Atrium employees from the bargaining unit and by failing to continue to provide them with the benefits set forth in the Agreement.

I also find after the 2013 sale Hamilton Park and The Atrium constituted a single employer for purposes of collective bargaining with respect to the Dietary, Housekeeping and Maintenance Departments.  It is well established two (2) separate business entities constitute a single employer for

45

purposes of collective bargaining if they have sufficiently integrated business operations. *Radio and Television Broadcast Technicians Local 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255 (1965); *Bolivar-Tees, Inc.,* 349 NLRB 720 (2007).

In evaluating the issue of single employer status, the following four (4) criteria are controlling: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership. I agree with the Union, in this instance, all four (4) factors have been met, thereby, establishing a single employer relationship between Hamilton Park and The Atrium for purposes of collective bargaining.

The testimony presented by the Union clearly established the interrelation of operations.  There is only one (1) Dietary, Housekeeping and Maintenance Department for Hamilton Park and The Atrium.  According to the credible testimony of Fuller and Perez, in the Housekeeping Department, even though an employee is assigned to either Hamilton Park or The Atrium, he or she will regularly work at both locations.

Fuller, who has been employed at Hamilton Park since 2001, testified he regularly performed housekeeping duties at The Atrium even though he was assigned and punched in at Hamilton Park.  (Transcript 102-103).  Fuller was assigned to the 3:00 p.m. to 11:00 p.m. shift and throughout his shift he was

46

required to work at The Atrium. (Transcript 103-104). Fuller also testified his co-worker regularly performed work at The Atrium as well. According to Fuller, his paycheck came from Hamilton Park even though he regularly performed work at The Atrium. (Transcript 104).

Perez, who commenced her employment at The Atrium in 2009, testified she submitted her job application at Hamilton Park. (Transcript 210). Perez also testified both before and after the 2013 sale she was required to perform housekeeping work at Hamilton Park even though she was regularly assigned to work at The Atrium and punched in at The Atrium. (Transcript 212). Perez testified her co-workers, Jacqueline Coalla and Christine Rivera, were also required to perform housekeeping functions at Hamilton Park. (Transcript 218-219, 224-225). As well, Perez testified to observing Manuel Quino, a housekeeping employee assigned to Hamilton Park, regularly performing housekeeping duties at The Atrium. (Transcript 226-228).

Both Fuller, who was regularly assigned to Hamilton Park, and Perez, who was assigned to The Atrium, testified the supervisor for both Hamilton Park and The Atrium in the Housekeeping Department was Donado.[9]  (Transcript. 104, 215).

---

[9] Donado was one of the individuals subpoenaed by the Union. Donado did not appear at the hearing.  (Transcript 263).

They both testified Donado prepares the schedule for both Hamilton Park and The Atrium.  (Transcript 105, 224).

Jerrie White, a Dietary Aide, testified she worked at Hamilton Park since 2012.[10] (Transcript 110). According to White, both prior to and after the 2013 sale, employees in the Dietary Department would regularly perform work at both Hamilton Park and The Atrium. (Transcript 111, 117). White stated she would punch in at Hamilton Park and receive a paycheck from Hamilton Park even for hours worked at The Atrium.  (Transcript 117).

The parties stipulated Locentilo is the Director of the Dietary Department for both Hamilton Park and The Atrium.[11]  He prepares the schedule for both facilities. (Stipulation 8, Transcript 115, 126). According to White's testimony, there is one (1) schedule which indicates the time she is assigned to Hamilton Park as well as the time she was scheduled to work at The Atrium.  (Transcript 120).  An example of this is reflected in the schedule for the Dietary Department for Augusts 25, 2015, (Union Exhibit No. 13).

The Union also demonstrated the interrelation of the Maintenance Department between Hamilton Park and The Atrium. The Union presented Kenneth Tomlin who has worked at Hamilton

---

[10]White was laid off on September 9, 2013, and recalled on October 21, 2013.

[11]Locentilo was subpoenaed but did not testify at the hearings.

Park since 2016.  According to Tomlin, he and other Maintenance Department employees regularly work at both Hamilton Park and The Atrium.  (Transcript 245-246).  As is the case with the Housekeeping and Dietary Departments, employees who work at in the Maintenance Department at Hamilton Park punch in at Hamilton Park and receive one (1) check from Hamilton Park, which includes hours worked at The Atrium. (Transcript 248).  Tomlin also testified there was one (1) supervisor, Miquel Espaillat, and one (1) Director, Eugene Shapiro, of the Maintenance Department.  (Transcript 244, 250).

One of the crucial factors to be considered in determining whether a single employer relationship exists for purposes of collective bargaining is whether there is centralized control of labor relations.  In regard to this important criterion, the unrefuted evidence establishes there is one (1) Human Resources Director for both Hamilton Park and The Atrium.  (Transcript 115-116).

Finally, I must examine the issue of ownership.  Even if Hamilton Park and The Atrium were sold in separate transactions, the documentary evidence clearly establishes there is common ownership of the two (2) entities.  To begin with, the Asset Purchase Agreement was signed by Kirschner in his capacity as the Managing Member of Hamilton Park Opco, LLC.  (Employers'

Exhibit No. 2).   Kirschner is presently registered as the officer Hamilton Park Opco, LLC and Hamilton Park Atrium Opco, LLC, the registered owner of the facilities. (Union Exhibit No. 17).   As well, both facilities are called Alaris Health and use the same logo.   (Union Exhibit No. 15).

I find all four (4) criteria have been met by the Union to establish a single employer relationship exists between Hamilton Park and The Atrium for purposes of collective bargaining. The fact that Hamilton Park is a long-term care facility and The Atrium is an assisted living facility, with different administrators, different mailing addresses, and may be separately incorporated, does not alter my conclusion.

A similar issue was before the NLRB in *The Child's Hospital, Samaritan Services Corp.,* 307 NLRB 90 (1992), where the Board found three (3) different operations, an acute care hospital, a nursing home and a corporation that provided services to both, constitutes a single facility for purposes of collective bargaining. The NLRB in reaching its decision held the operations, though separately incorporated, had centralized labor relations, common laundry, housekeeping, dietary, and engineering services and regular contact among employees).   *See also, Lutheran Welfare Services of Northeastern Pennsylvania,* 319 NLRB 886 (1995); *WeCare Transportation, LLC,* 353 NLRB 65 (2008); and *R&D Trucking, Inc.,* 327 NLRB 531 (1999).

Thus, for all of the foregoing reasons, the Union's grievance is sustained. The proper remedy in this case is to order the Employers to cease and desist from failing to apply the Agreement to employees who work at The Atrium in the Dietary, Laundry and Maintenance Departments.  The Employers are also directed to make all affected employees whole for any losses sustained as a result of the Employers' violation of the Agreement. If the parties do not, by February 28, 2018, agree on the losses suffered by the affected employees, my office shall be contacted in order to schedule a hearing solely for the purposes of assessing the damages owed to the individual employees.

**AWARD**

1. The Union's grievance is arbitrable.

2. The Employers violated the 2008 Agreement by failing to apply the Agreement to employees who work at The Atrium in the Dietary, Housekeeping (including Laundry) and Maintenance Departments after the 2013 sale of Hamilton Park.

3. The Employers shall cease and desist from violating the Agreement and shall, forthwith, apply the terms and conditions of the Agreement to employees who work at The Atrium in the Dietary, Housekeeping, (including Laundry) and Maintenance Departments.

4. The parties are directed to make all adversely affected employees whole.

5. For any adversely affected employees, if such damages have not been agreed to by the parties by February 28, 2018, in accordance with my Opinion above, a hearing shall be scheduled solely for the purpose of addressing damages owed to such individuals.

6. The Employer owes arbitration fees in this matter in the amount of nineteen thousand three hundred ($19,300.00) dollars. (Invoice Nos. 31578, 30762, 28001). Payment is due on this balance within thirty (30) calendar days of the date of this Award.

7. The Union owes arbitration fees in this matter in the amount of thirteen thousand three hundred ($13,300.00) dollars. (Invoice No. 31579). Payment is due on this balance within thirty (30) calendar days of the date of this Award.

March 16, 2018.

_____
Martin F. Scheinman, Esq.
Arbitrator

STATE OF NEW YORK        )
                         )  ss.:
COUNTY OF NASSAU         )

52

On this 16th day of March 2018, before me personally came and appeared MARTIN F. SCHEINMAN, ESQ., to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he executed the same.

Sworn to and subscribed
before me this 16th day
of March 2018.

_____
Notary Public

KATE TIERNEY
Notary Public, State of New York
No. 01TI6136538
Qualified in Queens County
Commission Expires November 7, 20 21

ALARIS.HAMILTONPARK.AWARD

53